```
            IN THE UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF DELAWARE

PAR PHARMACEUTICAL, INC.,    :
                             :
           Plaintiff,        :  No. 1:17-cv-944-JFB-SRF
                             :
       v.                    :
                             :
HOSPIRA, INC.,               :
                             :
           Defendant.        :



                Wednesday, March 27, 2019
                10:00 a.m.

                Markman
                Courtroom of Judge Sherry R. Fallon

                844 King Street
                Wilmington, Delaware


    BEFORE:    THE HONORABLE Sherry R. Fallon,
              United States District Court Magistrate


    APPEARANCES:


                RICHARDS, LAYTON & FINGER P.A.
                BY:  STEVEN FINEMAN, ESQ.

                        -and-

                LATHAM & WATKINS LLP
                BY:  DANIEL BROWN, ESQ.
                BY:  KENNETH SCHULER, ESQ.
                BY:  KAMILAH ALEXANDER, ESQ.

                    On behalf of Plaintiffs
```

1    APPEARANCES CONTINUED:

2

3                    PHILLIPS GOLDMAN McLAUGHLIN &
                     HALL, P.A.
                     BY:  MEGAN HANEY, ESQ.
4

5                                    -and-

6                    WILLKIE FARR & GALLAGHER LLP
                     BY:  MATTHEW FREIMUTH, ESQ.
                     BY:  RONALD LEE, ESQ.
7

8                        On behalf of Defendant

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                    THE COURT:  Good morning,

 2     everybody.  Please be seated.  This is the time

 3     that I have set for the claim construction

 4     hearing in Par vs. Hospira.  Let's start with

 5     the introductions of counsel for the Plaintiffs.

 6                    MR. FINEMAN:  Good morning, Your

 7     Honor.

 8                    THE COURT:  Good morning,

 9     Mr. Fineman.

10                    MR. FINEMAN:  Steve Fineman from

11     Richards, Layton & Finger on behalf of Par.  It

12     gives me pleasure to introduce to the Court

13     today, Your Honor may recall Dan Brown.

14                    MR. BROWN:  Good morning, Your

15     Honor.

16                    MR. FINEMAN:  Ken Schuler.

17                    MR. SCHULER:  Good morning, Your

18     Honor.

19                    MR. FINEMAN:  Kamilah Alexander

20     and in the back, Jeanni Corrone from Par.

21                    THE COURT:  Welcome.  Good

22     morning.

23                    MR. FINEMAN:  Your Honor, may I

24     approach to hand the Court the presentation?
```

```
 1              THE COURT:  Certainly.  All right.
 2     The Court has been presented with Plaintiffs'
 3     claim construction presentation which will be
 4     Plaintiff Exhibit 1 to the oral argument today.
 5              MS. HANEY:  Good morning, Your
 6     Honor.  Megan Haney from Phillips Goldman on
 7     behalf of Hospira.  And with me today is Matthew
 8     Freimuth.
 9              MR. FREIMUTH:  Good morning.
10              THE COURT:  Good morning.
11              MS. HANEY:  And Ronald Lee.
12              MR. LEE:  Good morning.
13              THE COURT:  Good morning.
14     Welcome.  I have as you might expect read the
15     briefs, read them a couple of times and I'm
16     ready to get started.  I don't need much in
17     terms of the black letter law on claim
18     construction.  We can get right into construing
19     the terms and the indefiniteness argument.
20              I assume that Plaintiffs will be
21     going first; is that right?
22              MR. BROWN:  Yes, Your Honor.
23              THE COURT:  All right.  I'm ready
24     to begin.
```

```
 1                    MR. BROWN:  Good morning, Your
 2        Honor.  Dan Brown representing Par.  We would
 3        submit that this is really a straight-forward
 4        claim construction exercise.  And as I went
 5        through the briefs the last couple of days in
 6        more detail, it seemed to me there's a lot of
 7        excess verbiage in there trying to drill down on
 8        a pretty simple concept that I think the Court
 9        understands very well, which is the terms at
10        issue and let me skip ahead.
11                    So I put the claims up for a
12        minute.  The term claims at issue are Impurity
13        A, Impurity B and Unknown C are labels.  The
14        analogy that popped into my head is it's like
15        Exhibit A in a court's trial.  If I don't tell
16        you what trial, you don't know what Exhibit A
17        is.
18                    But if you read in the post-trial
19        brief in reference to Exhibit A, that tells you
20        when you read through the record you're going to
21        find some reference to a unique document,
22        specific document that is Exhibit A and you just
23        need to look into the record and figure out what
24        that label refers to.  But you know if it's a
```

```
1        singular thing, Impurity A., it's not a class.

2        It's not a category.  It's not a group.  It is a

3        particular thing.  You're trying to figure out

4        what that thing is.

5                    So no one is confused by the fact

6        that there's a trial starting next week and a

7        different document is going to be labeled

8        Exhibit A in that trial.

9                    THE COURT:  But if Exhibit A is

10       only one, it may be Exhibit A and it's not

11       exactly Exhibit A, then how can you be sure of

12       what Exhibit A actually is?

13                   MR. BROWN:  I think for that you

14       follow the old-fashioned Federal Circuit

15       analysis of what do you look at in what order to

16       come to the claim construction and what is the

17       proper analysis to go through.  The standard

18       analysis is start with the language of the

19       claims.

20                   So as we look at the claims here,

21       all three that are at issue now are dependent

22       claims off of independent claim 1.  There's

23       different numbers in the other patent, but the

24       issues are identical.  As you march through the
```

```
 1        limitations of independent claim 1, you have a

 2        variety of elements that are classes of things.

 3        A range of about 6 to 8 milligrams per

 4        milliliters of a raising agent, that's a

 5        category of things.

 6                    In the range of about 2.8 to 3.8

 7        milligrams per milliliters of a pH raising

 8        agent, that's a category of things.  One of the

 9        things that I will get to in a moment is there's

10        a couple of different lines of cases that

11        Defendants are relying on that we don't think

12        are apposite, and one of them is the single

13        embodiment line of cases.

14                    There are a lot of different

15        things that fall -- embodiments of the invention

16        that fall within each of these claims as

17        properly construed.  You can have about 2.8

18        milligram per milliliters of a pH raising agent.

19        You can have about 3.8 milligrams per

20        milliliters.  You can have a different pH

21        raising agent.  All of those things are

22        different embodiments that fall within these

23        claims.  We're not doing anything that violate

24        the single embodiment case law.
```

```
 1                  And then we would submit looking
 2        at the linguistics of the individual claims,
 3        when you see 1 percent or less of Impurity A,
 4        that designates to someone in this art that that
 5        is a specific compound, a particular compound,
 6        that is singular and not plural and we're going
 7        to look to the intrinsic evidence to see what
 8        that compound is.
 9                  I did want to point out in
10        Hospira's opening brief at Page 8, they use the
11        term label for these, Impurity A, Impurity B and
12        Unknown C.  In their initial description they
13        use the term label.  And for that they cited the
14        Bergren testimony at Exhibit B to their brief at
15        Page 70, Lines 11 to 18.  So I think that
16        everybody actually knows what this is.
17                  So that brings the legal issue of
18        what analysis to apply.  And Power Integrations
19        I think provided the right analysis here.  I
20        think there are two different analyses that are
21        being bandied about and mixed and matched.
22                  Starting with Power Integrations,
23        if the claim doesn't have an ordinary meaning,
24        you have to turn to the remaining intrinsic
```

1    evidence, including the written description to

2    aid in the claim construction exercise.  That is

3    in contrast to a different analysis that

4    applies.

5                When you have a claim term that

6    has an ordinary meaning, if I said organic acid,

7    that has an ordinary meaning.  And if I wanted

8    that to include something that doesn't fall

9    within there, I now have an enhanced burden.  If

10   I take a term of art and want to make it mean

11   something different, my enhanced burden is I

12   have to very clearly say in the specification it

13   doesn't mean what it normally means.  It means

14   something different, or I have to have a

15   disclaimer during the prosecution of the case

16   and say it doesn't.

17                But if I don't have an ordinary

18   meaning, then I just do the ordinary claim

19   construction exercise which is read the

20   specification, read the prosecution history if

21   it's relevant and figure out what the claim term

22   means.

23                Everybody agrees Impurity A and

24   Impurity B and Unknown C outside the context of

```
 1        the patent application, if you say this to a
 2        skilled artisan and you're not referencing
 3        anything particular much as you would Exhibit A,
 4        it doesn't identify anything particular.  So
 5        this is the Hill-Rom v. Stryker provides the
 6        doctrine that we think Hospira is trying to
 7        invoke, but that applies when there is a plain
 8        and ordinary meaning.
 9                   So turning first to the
10        specification, this is the principal section
11        that discusses Impurity A, Impurity B and
12        Unknown C.  And there's a couple more I'm going
13        to get to in a minute, but I want to focus on
14        this for a second because as the section starts
15        out, it states in some embodiments the present
16        invention may have low levels of degradents,
17        Impurity A, Impurity B and/or Unknown C.
18                   So what the patent is telling you
19        here is these are things we're trying to
20        minimize.  They're impurities.  We don't want
21        very much of them.  And as you saw a moment ago
22        in claim 1, you don't have to have any of them.
23        They can be completely absent and fall within
24        claim 1 and fall within the invention.
```

```
 1                   As you come into the language that
 2        I think is the central fight in this battle,
 3        Hospira is picking up on in the next line which
 4        says, in some embodiments Impurity A may be a
 5        compound with the following structure.  They
 6        want to create a corollary statement that isn't
 7        there.
 8                   They want to create a statement
 9        that says, in other embodiments Impurity A could
10        be anything and that's not stated.  And we think
11        the fair reading of this is in claim 1, for
12        example, you don't have to have Impurity A.
13        You're trying to minimize the amount of this.
14        It's an impurity.  You want to have a low amount
15        of it.
16                   So the qualified language is
17        saying you don't have to have Impurity A and we
18        don't have to prove the presence of Impurity A
19        for it to fall within the broadest scope of the
20        invention as we've described it in the patent.
21        So that's the conditional language, it's not in
22        every single claim and therefore it may be
23        present.
24                   Hospira agrees for all of A, B and
```

1        C that there is a single example provided.

2        There isn't any language, discussion or

3        description indicating anything different than

4        what's shown here on Slide 11 for Impurity A,

5        what's shown on Slide 12 here for Impurity B.

6        And then for Unknown C, that structure has not

7        been solved to our knowledge.  So we provide the

8        data and the process by which a skilled artisan

9        shows that it's there.

10               The next section that I think is

11       relevant, in our opening brief we cited this on

12       Pages 8 and 9 and this was also a focus of the

13       claim chart when we had to describe our

14       intrinsic evidence.  And what I thought was

15       interesting is in Hospira's reply brief at Page

16       5, they provide what I think is really a core

17       description of their position in the case which

18       is that Impurity A, Impurity B and Unknown C

19       could refer to "any unspecified degradent."

20               But here in Figure 4 the patent

21       tells you the opposite.  It says, label peaks

22       are specified degradents.  Here you have a label

23       attached to the peak which the description

24       states is a specified degradent, so we think

```
1        that removed any doubt that we're talking about

2        an individual component which would then fall

3        within the structure provided for A and B and

4        with the data in the analysis provided for

5        Unknown C.

6                     I touched on this a little bit,

7        but the single embodiment cases we would submit

8        simply don't apply.  Those, first of all, as I

9        discussed a minute ago the embodiments of the

10       formulation of the invention cover a range of

11       things that are identified in the claim.

12                    It's not claims are not limited to

13       a single embodiment.  There is no principle

14       whatsoever in patent law that a single term

15       can't be limited to a single thing when it is a

16       singular label, and there's a case that was

17       referenced in the briefs where mannitol means

18       mannitol.  And there's no rule that says it

19       needs to mean a broader scope of things.

20                    It's indicated as a label.  We've

21       identified what the thing labeled is and there's

22       no rule that says it should be broader than

23       that.  So now I would like to proceed from the

24       claim construction issue which we submit this is
```

1     a straight-forward exercise.  I would like to

2     proceed from that issue into the indefiniteness

3     arguments that are at play here.

4                    THE COURT:  Let me ask you one

5     question before you leave the claim

6     construction.  I think I read this in Hospira's

7     brief, but Hospira points out that Par's

8     proposed construction for Impurity A and

9     Impurity B, the constructions do not account for

10    the chromatographic measurements identified in

11    Figures 1 through 4.

12                    So why is chemical structure

13    sufficient to define these terms in Par's view

14    without incorporating the chromatographic

15    measurements?

16                    MR. BROWN:  Certainly.  So I'll

17    just draw another analogy.  If I have two of my

18    criminal defendants and I only have a

19    fingerprint for the third, I can say it's John

20    and Bob and whoever fits this fingerprint.  So

21    here we've identified what the structure is for

22    A and B.  The chromatographic evidence shows

23    what those are.

24                    It's evidence of who those

```
 1        individuals are, but it doesn't need to be part

 2        of the claim construction because we've

 3        identified specifically what the compound is.

 4        Unknown C, we have not identified what the

 5        compound is but we have the chromatographic

 6        evidence.

 7                   And that's what we have, it's

 8        precise enough so it suffices to be a definite

 9        claim construction but we don't have the

10        structure.  The structure is preferable if you

11        have it, so that's why we adopted that.  Does

12        that answer the Court's question?

13                   THE COURT:  For now.  We can move

14        on to indefiniteness.

15                   MR. BROWN:  Thank you, Your Honor.

16        I wanted to jump ahead to Slide 19.  This is

17        from Page 6 of their opening brief.  So our

18        understanding is that the indefiniteness issue

19        is entirely contingent upon Hospira's contention

20        that the terms are not amenable to claim

21        construction.

22                   We haven't seen anything in their

23        contentions that if our construction is adopted,

24        that this structure or the data itself is
```

```
 1        nonetheless indefinite.  So they've contended
 2        that it's indefinite because it's not amenable
 3        to construction.
 4                    So moving on to indefiniteness,
 5        indefiniteness is an invalidity position.  It's
 6        a classic patent law invalidity position.  That
 7        means it has to be proven by clear and
 8        convincing evidence.  So in this current context
 9        we don't think there is a -- this is not a
10        motion for summary judgment.  This is a claim
11        construction exercise.  So we don't think this
12        is really an invalidity issue that is fully
13        presented.
14                    So moving next to Slide 20, we've
15        cited the Masimo case.  The Federal Circuit has
16        addressed similar issues before and numerous
17        courts have addressed similar issues before, and
18        I'll get to the Reckitt Benckiser case in a
19        moment which I think is very on point, but in
20        the Masimo case the court just addressed this
21        sort of qualified language that appears in many
22        patents, in saying using may in a context
23        doesn't override the specification as a whole
24        and the implications could be drawn from it.
```

```
 1              And I want to skip ahead to the
 2    Reckitt case.  This is a case in front of Judge
 3    Andrews a couple of years ago.  There you have a
 4    very similar series of statements in the patent.
 5    The term optimize absorption was at issue.  And
 6    there was a statement in the specification that
 7    the term optimizing absorption does not refer to
 8    reaching the maximum absorption.  One might
 9    think that's what it meant, but it doesn't.
10              And then it says the optimum
11    absorption may be, for example, a level that
12    provides bioequivalent absorption as
13    administration of the currently available
14    Suboxone tablet.  And there was nothing else.
15    There wasn't anything that provided -- we know
16    what it's not.  It's not maximum absorption.
17              We know an example of it which is
18    bioequivalent absorption and there wasn't any
19    further discussion of that, and Judge Andrews
20    found that that did not rise to the level of
21    proving indefiniteness.
22              THE COURT:  Right, but Judge
23    Andrews, did he not find that even in adopting a
24    construction that was informed by the single
```

```
 1        example in the specification, he didn't limit it

 2        to that single example, whereas here isn't Par

 3        more or less advocating that the proposed

 4        constructions will be more or less restricted by

 5        the examples provided in the specification?  How

 6        do you align that argument with the Reckitt

 7        case?

 8                   MR. BROWN:  Certainly.  I think it

 9        comes down to the terms themselves.  Optimizing

10        the absorption or optimum absorption by its own

11        terms would characterize some range of

12        absorptive characteristics.  You just have to

13        figure out what those are.

14                   We've chosen a term that people in

15        the art recognize as a label, Impurity A.  It

16        refers to a specific thing and we're trying to

17        figure out what the thing is.  And when we get

18        to the specification and there's some language

19        about using the word may, which we think is

20        fairly read to mean it doesn't have to be there

21        as opposed to there are other innumerable

22        unnamed things that would also be named Impurity

23        A, we don't think that's a fair reading.

24                   I think that's a principal
```

```
 1        difference here where the term itself is what
 2        would indicate a scope of disclosure rather than
 3        a particular thing.  Our language indicates a
 4        particular thing.
 5                    THE COURT:  All right.  Thank you.
 6                    MR. BROWN:  And then one thing we
 7        also wanted to point out, we've had the battle
 8        back and forth in this case about production of
 9        samples.  And in that context, Hospira took the
10        position which we think is relevant to the
11        indefiniteness position is you don't need any
12        extra evidence from what they have already
13        provided.
14                    They've never identified Impurity
15        A, Impurity B or Unknown C in their work, but
16        they have provided data on the level of
17        impurities in their product and they've
18        contended in that context that no further
19        evidence is necessary to adjudge infringement,
20        and we would submit that that is relevant under
21        the Nautilus case, which part of the purpose of
22        this is to be able to determine are you inside
23        or outside the claims.  And this is in D.I. 125
24        at Page 3.
```

```
1                     With respect to chromatographic
2        for Unknown C where we don't have a structure
3        and we've provided chromatographic information,
4        we would submit that that is an acceptable and
5        standard procedure in the art for identifying
6        compounds.
7                     Eric Zhang who was Hospira's
8        30(b)(6) witness on their development and was
9        largely responsible for the development of their
10       product, he gave testimony and we've also
11       provided expert testimony that this is a
12       procedure in the art.  As long as you know the
13       location of that impurity, you can put a generic
14       name to it.  You can call it, for example,
15       Impurity A.  Then you just need to control the
16       Impurity A to a certain level without knowing
17       exactly what A is in the terms of molecular
18       structure and things like that, so this is
19       standard.  And that was at D.I. 151, Exhibit 5
20       transcript at 81, Lines 21 to 23.
21                      Hospira in its opening brief at
22       Pages 7 and 8 effectively we think concede that
23       this is a normal process.  With that, I think I
24       will -- I've gotten a note from my colleague.
```

```
 1        My colleague points out -- well, I'll go to
 2    Slide 15 in a second, but Slide 28 we have cases
 3    where the terms alpha form crystal and beta form
 4    crystal were found indefinite.
 5                    These are again single terms and
 6    the court had no problem determining them as
 7    single things.  And then Slide 15, similarly
 8    Form A was defined as a particular thing, and
 9    that's again a singular term.  So if the term
10    doesn't denote a group of things, we think
11    specifying it to be a particular thing is
12    entirely appropriate and consistent with the
13    case law.
14                    THE COURT:  All right.  I'm ready
15    to hear from the Defendants.  Do you have a
16    slide --
17                    MR. FREIMUTH:  I don't actually,
18    Your Honor.  I had one, but frankly most of it
19    was material that was reflected here anyway.
20                    THE COURT:  All right.  Very well.
21                    MR. FREIMUTH:  I think we are all
22    in fair agreement today that the terms Impurity
23    A, Impurity B and Unknown C standing on their
24    own are generic terms.  They're frequently terms
```

```
 1        that are used as shorthand designations.

 2                    In the art Dr. Panull has offered

 3        an opinion as much.  Dr. Schoeneich, Par's

 4        expert, agrees.  Dr. Bergren, the named inventor

 5        on the patent testified that the disputed terms

 6        are arbitrary name designations that in and of

 7        themselves don't reflect anything.

 8                    So faced with that fact, the court

 9        today must address the question of whether or

10        not Par's construction is appropriate.  Failing

11        that, Hospira submits that the terms fail to

12        inform with reasonable certainty those skilled

13        in the art about the scope of the invention and

14        are, therefore, indefinite.

15                    So in an effort to understand or

16        construe these terms, Par turns to the intrinsic

17        record.  And we agree that that's where this

18        analysis leads straight to the specification.

19        Looking at the specification, Par asked the

20        Court to adopt a construction that limits the

21        terms Impurity A, Impurity B to single

22        structures and in the case of Unknown C, to a

23        single chromatographic profile.  But the

24        specification expressly describes these as
```

```
 1        nonlimiting features.
 2                  As Your Honor pointed out, the
 3        specification uses the words in some embodiments
 4        and may.  And really what this dispute is about
 5        is what is the import of those words in the
 6        specification.  As Par has pointed out, we rely
 7        and cite throughout our papers on a line of
 8        cases based on Liebel-Flarsheim which says that
 9        in the specification a single embodiment of an
10        invention does not limit the scope of the claims
11        to that disclosure and unless the patentee has
12        demonstrated a pure intent to limit claim scope
13        using words or expressions of manifest exclusion
14        or restriction.
15                  Essentially what Par's argument
16        boils down to is this Court must construe
17        Impurity A, Impurity B and Unknown C according
18        to the specification because those are the only
19        examples provided in the specification.  And in
20        making that argument we contend, Your Honor,
21        they run smack into that Federal Circuit
22        precedent.
23                  The Hill-Rom case describes I
24        think in really powerful examples that appear on
```

```
 1        Page 1372 of that decision what words and
 2        expressions of manifest exclusion or restriction
 3        look like to the Federal Circuit.  Those words
 4        are words like the present invention requires,
 5        the present invention is, all of the embodiments
 6        are.  Contrast that language with what you have
 7        here, in some embodiments may, and we're in a
 8        very different landscape.
 9                    THE COURT:  But in Hill-Rom didn't
10        the court find that disclaimer of claim scope is
11        not applicable where those disputed terms have
12        no plain and ordinary meaning, and the parties
13        are in agreement here that the disputed terms
14        have no ordinary meaning?
15                    MR. FREIMUTH:  I don't know that
16        Hill-Rom, Your Honor, expressly found that that
17        disclaimer doctrine had no application in a
18        context where the claim term at issue has no
19        plain and ordinary meaning, which leads me to my
20        next point which is Par attempts to sort of get
21        out from under this line of cases based on, as I
22        can see it, three arguments.
23                    The first being that this doctrine
24        simply is inapplicable.  I think if you look at
```

1      what Par is essentially arguing is they are

2      essentially attempting to disclaim claim scope

3      in order to salvage the validity of their claim

4      terms.  And the issue is that the choice of the

5      words in some embodiments may expressly leaves

6      open the possibility that Impurity A could mean

7      something else in other embodiments.

8                    So we contend for that reason

9      Par's efforts to distinguish these cases on that

10     basis really doesn't make sense.  The other case

11     we point Your Honor to is Interval Licensing

12     which is a Federal Circuit case.  That case

13     involved a term that similarly the parties

14     agreed had no plain and ordinary meaning.

15                   And in that context, the patentee

16     tried to narrow the claim scope based on the

17     fact that there was an example in the

18     specification that was prefaced with the Latin

19     abbreviation e.g.  And applying the very similar

20     principles that the court in Liebel applied, the

21     court concluded that because the language from

22     the specification was merely an example, they

23     were unwilling to narrow claim scope to

24     essentially salvage the invalidity argument.

```
 1                THE COURT:  In Interval Licensing,
 2      didn't the Court find that the disputed term was
 3      "facially subjective," and can we contrast that
 4      to this case in which the chemical structures
 5      associated with Impurities A and B in the
 6      specification of the patents-in-suit, they do
 7      provide an objective measure for a person of
 8      ordinary skill in the art?
 9                MR. FREIMUTH:  I think there is
10      agreement that on the face of the claims just
11      here, just like in Interval Licensing, the claim
12      terms are subjective entirely.  With respect to
13      the chemical structures identified in the
14      specification, again that is prefaced with the
15      language in some embodiments and may, which we
16      think is significant.
17                And I'll come back to this, but
18      from the perspective of a person of ordinary
19      skill, if they're doing development work on an
20      epinephrine formulation and they come up with an
21      unknown impurity in a chromatogram and they name
22      that impurity Impurity A in the course of their
23      development work and let's even say they're
24      reasonably confident that it's an oxidative
```

```
 1        impurity and they're wondering whether they

 2        infringe the relevant claims here and they look

 3        to the specification, they see language that

 4        says in some embodiments Impurity A may mean X

 5        or may have this structure.

 6                    They don't know whether or not in

 7        other embodiments Impurity A might have another

 8        structure and therefore they can't tell whether

 9        or not their product, for instance, the claim

10        limitations involving Impurity, that's the

11        essence of our argument on indefiniteness and

12        really highlights the fact that the choice of

13        the words in the specification in some

14        embodiments Impurity A may mean X has

15        consequences.

16                    THE COURT:  If you would address

17        freely that topic, Par's Slide 26 where they

18        produce some -- it came from a different motion,

19        not in this brief, but it was the opposition of

20        a Motion to Compel samples in which it was

21        argued by Hospira's expert that essentially a

22        person of ordinary skill in the art, and I'm

23        paraphrasing, could determine infringement based

24        on the data involving Impurity A, Impurity B and
```

```
 1        Unknown C?

 2                   MR. FREIMUTH:  I think the issue

 3        there, Your Honor, is that in the context of

 4        Hospira's argument, our stability data showed

 5        that we had no unspecified impurities that rose

 6        to the level specified in the claims at issue.

 7        Therefore, we could determine that whatever

 8        Impurity A, B and Unknown C are, our product

 9        didn't contain them.

10                   That's slightly different from the

11        hypothetical that I just asked Your Honor to

12        consider which is a person of ordinary skill

13        developing an epinephrine formulation who

14        identifies an unknown impurity doesn't know what

15        it is and is uncertain whether or not that

16        unknown impurity is the Impurity A, the Impurity

17        B or the Unknown C specified in the claims.

18                   The other arguments that Par uses

19        to try to distinguish or to get out from

20        underneath this line of cases led by Liebel-

21        Flarsheim is this notion that the cases only

22        refer to the instance where you've got a claim

23        term that is a genus, and what we're talking

24        about is disclaimer of a subset.
```

```
 1                      I think if you look at the term at
 2          issue in Liebel-Flarsheim itself, it was syringe
 3          receiving opening.  We don't think that's any
 4          more of a genus than Impurity A, Impurity B or
 5          Unknown C.  Similarly in the Kao case, Judge
 6          Robinson construed the term cosmetic article
 7          using the principles articulated in the Liebel
 8          case.  That similarly is not a genus.  So we
 9          don't think there's any basis to sort of limit
10          the application of that doctrine to claims
11          involving a genus.
12                      Also in their papers, Par makes
13          the point that Kao and Phillips, which we also
14          rely on, are distinguishable because those cases
15          involve instances of multiple embodiments
16          disclosed in the patent.  Where if you look at
17          those cases, both decisions quote from and note
18          the precedent articulated by the Circuit in
19          Liebel.
20                      Again, we approach this claim
21          construction argument from the perspective of
22          really the only thing that Par argues supports
23          their construction is the fact that nowhere else
24          in the specification are Impurity A, Impurity B
```

```
 1        and Unknown C defined and we contend that that

 2        runs squarely into this principle that we've

 3        relied on.

 4                      The cases that Par relies on in

 5        particular, and I'm glad they're on the screen

 6        now is Astellas and Celgene, we think are easily

 7        distinguishable.  If you look at Celgene, for

 8        example, the court notes that the '357 patent

 9        specification expressly defines Form A based on

10        observed attributes.

11                      These aren't situations based on

12        the opinions that address the situation where

13        the specification uses a nonlimiting descriptor

14        before an embodiment to define a particular

15        compound.  Also importantly, in both of these

16        cases I believe there were issues where -- well,

17        I believe in both of these cases, if it's not

18        these cases, it's another line that I will talk

19        about in a minute, there were issues where the

20        patentee used a narrower construction in the

21        context of patent prosecution to overcome

22        arguments which is not what's happened here.

23                      The principal cases relied upon by

24        Par for the notion that there's no bright line
```

```
 1        rule that claim terms can't be construed to

 2        cover a single example we also think are

 3        distinguishable.  The Masimo case that Par just

 4        discussed in its presentation was one of those

 5        cases where the claim term at issue was -- the

 6        narrowed definition of the claim term at issue

 7        was used by the patentee in the course of

 8        prosecution to overcome prior art.

 9                    The same is true in the Medicines

10        case which they relied on and also Wang

11        Laboratories, so we think that all of those

12        cases are relatively easily distinguishable.  In

13        sum, Par in its specification uses permissive

14        language.  In some embodiments, Impurity A may

15        be this.  In doing so, just as Judge Robinson

16        ruled in the Kao case, they expressly have left

17        open the possibility that in other circumstances

18        in other embodiments Impurity A might be

19        something different.

20                    That choice in the specification

21        has consequences in that it leads to potential

22        confusion on the part of the person of ordinary

23        skill as to whether or not their formulation

24        meets the limitations specified in the claims.
```

```
 1        On the basis of that, Your Honor, the fact that
 2    we believe that adopting Par's construction in
 3    the face of the language in the specification
 4    would be contrary to well-established principles
 5    of claim construction means that the claim terms
 6    should necessarily be ruled indefinite,
 7    particularly in the face of almost universal
 8    evidence on both sides of this case that
 9    standing alone, those terms are generic terms
10    that have no clear meaning and not in the art.
11                  THE COURT:  Okay.  Thank you.
12    Mr. Brown, rebuttal?
13                  MR. BROWN:  Thank you, Your Honor.
14    I want to spend just a couple of minutes first
15    on the Liebel-Flarsheim case and the Kao case
16    and the legal standard that flows therefrom.
17                  First of all, the cases discussing
18    the restrictive language and the disclaimer
19    cases, and there's one cited on Pages 1 and 2 of
20    Defendant's opening brief, the Sony v. Thorner
21    case, in Sony v. Thorner they used the language
22    you need to clearly redefine the term.
23                  If you don't have a plain and
24    ordinary meaning, there's nothing to redefine.
```

1    If you don't have a plain and ordinary meaning

2    in the Liebel-Flarsheim case, there's nothing to

3    disclaim.  And what is missing from this case is

4    any reasonable subset or set of other things

5    that would be disclaimed or would need to be

6    clearly defined away.  There's only one thing

7    mentioned in the specification.

8              And in the context of the entire

9    specification as we saw here on Figure 4 on

10   Slide 14, they say these are specified

11   degradents.  We think that tells somebody -- in

12   addition to the fact that you have the singular

13   term Impurity A, Impurity B, Unknown C, we think

14   that identifies a specific thing.

15             When you look at Liebel-Flarsheim

16   and the Kao case, the terms -- it's a little

17   difficult when you get into more mechanical

18   things but syringe receiving opening, I can

19   envision a whole bunch of things that that can

20   be.  It can be a hole.  It can be a square.  It

21   can be a variety of things.  And even though

22   it's a singular word, in a mechanical context

23   that is describing a genus.

24             In the Kao case, it was keratotic

```
1        plug remover.  Well, that's a singular word.

2        The court inclined to limit it to poultice

3        because there are other kinds of things that

4        would be a keratotic plug remover.  The terms

5        are designating a group of things.

6                  Impurity A which the patent calls

7        a specified degradent and by a particular set of

8        data and then elucidates the structure is not

9        one of those things.  I wanted to point out very

10       briefly in the Celgene case, based on the

11       specification a POSA would understand Form A to

12       mean a particular polymorph with these

13       distinguishing characteristics.

14                  So again, you're talking about

15       Form A.  Somebody skilled in the art knows that

16       refers to a thing.  It's not anything anybody

17       might label Form A randomly.  It's something

18       that those inventors have chosen to label Form

19       A.

20                  Alpha form crystal, similarly

21       that's something somebody skilled in the art

22       upon reading it would know.  That's a label I've

23       put to a particular thing, and there's nothing

24       at all in the precedent that suggests you can't
```

```
1      limit a particular thing to a particular thing.

2      Thank you, Your Honor.

3                      THE COURT:  All right.  Anything

4      further from Hospira?

5                      MR. FREIMUTH:  No, Your Honor.

6                      THE COURT:  All right.  Very well.

7      Thank you for going right to the essential

8      issues here and being very efficient and

9      succinct in your presentations.  It was helpful.

10                     I will take this under advisement

11     and issue a claim construction Report and

12     Recommendation fairly promptly or at least

13     within the time frame indicated in the

14     scheduling order.  That concludes our

15     presentation.

16                     Is there anything further from the

17     Plaintiffs before we adjourn?

18                     MR. BROWN:  No, Your Honor.

19                     THE COURT:  Anything further from

20     the Defendants?

21                     MR. FREIMUTH:  No, Your Honor.

22                     THE COURT:  All right.  Thank you,

23     everyone.

24                     MR. FINEMAN:  Thank you, Your
```

1    Honor.

2                        MS. HANEY:  Thank you, Your Honor.

3                        MR. BROWN:  Thank you, Your Honor.

4                        MR. FREIMUTH:  Thank you, Your

5    Honor.

6                        (The proceedings ended at

7    10:55 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                C E R T I F I C A T I O N

 2

 3               I, Taneha Carroll, Professional

    Court Reporter, certify that the foregoing is a
 4
    true and accurate transcript of the foregoing
 5
    proceeding.
 6

 7               I further certify that I am neither

 8  attorney nor counsel for, nor related to nor

 9  employed by any of the parties to the action in

10  which this proceeding was taken; further, that I am

11  not a relative or employee of any attorney or

12  counsel employed in this case, nor am I financially

13  interested in this action.

14

15

16               /s/Taneha Carroll
                 Taneha Carroll
17
                 Professional Reporter and Notary Public
18

19

20

21

22

23

24
```